1

2

3

4

5

6

7

8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    EDDIE D. KNIGHT,                          No. CIV S-07-0751-FCD-CMK-P

12                    Plaintiff,

13            vs.                               <u>FINDINGS AND RECOMMENDATIONS</u>

14    LEA, et al.,

15                    Defendants.

16    _____/

17            Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18    to 42 U.S.C. § 1983.  Pending before the court is defendants' unopposed motion for summary

19    judgment (Doc. 39).[1]

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    _____

26    [1]       The motion was originally filed by defendants Lea, Simmerson, Gower, Hale,
      Wong, and Oftiedahl.  Defendant Lyons subsequently joined in the motion.

1

# I. BACKGROUND

### A.    Plaintiff's Allegations

This action proceeds on plaintiff's first amended complaint, filed on February 8, 2008 (Doc. 16).  Plaintiff names Lea, Oftiedahl, Lyons, Simmerson, Gower, Hale, and Wong. This action stems from an incident on June 24, 2005, where plaintiff was stabbed ten times by inmate Jackson.  Plaintiff includes an "attachment" setting forth allegations as to each of these defendants:

Lea

In "Attachment A," plaintiff claims that, during a classification hearing held on November 6, 2003, defendant Lea informed plaintiff that an "R-suffix" was being placed in plaintiff's central file due to a "425 PC alleged violation in plaintiff's probation report. . . ." According to plaintiff, defendant Lea knew this information was false and that it would "reflect upon plaintiff's 'paper work.'"  He states that an R-suffix identifies him to other inmates as a child molester and that this designation would subject him to attacks.  Plaintiff states that, even though defendant Lea knew all this, she did nothing to "invoke normal protocol for a prisoner noted as a 'R' suffix child molester."  He states that defendant Lea "intentionally placed inmate Knight in general population knowing and with deliberate indifference cause inmate Knight to be stabbed."

Oftiedahl

In "Attachment B," plaintiff states that defendant Oftiedahl was present at the November 2003 hearing.  He states that, by being present, defendant Oftiedahl acted "in conjunction with Captain M. Lea, to place this erroneous information they both were knowledgeable of what they were doing."  According to plaintiff, defendants knew the R-suffix classification was based on an error but nonetheless left it in his file.

/ / /

/ / /

Lyons

Plaintiff sets for allegations as to defendant Lyons in "Attachment C." Specifically, plaintiff states that, on April 11, 2005, he informed other correctional officers that his life was in danger.  According to plaintiff, defendant Lyons was present and, upon hearing this, informed the other correctional officers that the R-suffix designation was added because plaintiff had "killed his wife and stabbed his step daughter."  He states "this was done within the clear hearing distance of other inmates and free staff further putting plaintiff's life in danger."

Simmerson

As to defendant Simmerson, plaintiff outlines his allegations in "Attachment D." Plaintiff claims that during the April 2005 episode defendant Simmerson told plaintiff:  "Tell me something or I'll put you back out on the yard and tell them (meaning inmates) what you have been up here telling us."  Again, plaintiff states this was done in the "plain hearing of other inmates further putting plaintiff's life in serious danger."

Gower

In "Attachment E," plaintiff states that, on April 22, 2005, he "approached staff" saying that he had safety concerns.  At a subsequent classification hearing, plaintiff states that defendant Gower told him:  "I want to put you back out on the yard on D yard."  Plaintiff responded:  "You can't do that; if you do that you will get me stabbed."  According to plaintiff, he was put back in the general population notwithstanding his objection to defendant Gower.

Hale

Plaintiff alleges in "Attachment F" that, at a May 26, 2005, classification hearing, he told defendant Hale that his life would be in danger if he was placed in the general population. He claims that, even though defendant knew of a risk to his safety, he allowed plaintiff to be returned to the general population.

/ / /

/ / /

3

1      <u>Wong</u>

2           In "Attachment H," plaintiff states that defendant Wong knew of his safety

3    concerns and "placed me on D yard anyway over my objections saying I would be stabbed and

4    then . . . lied . . . saying I was in agreement with the committee's actions."

5    **B.    Defendants' Evidence**

6           Defendants' evidence primarily relates the factual allegations regarding the R-

7    suffix which form the basis of plaintiff's claims.  In the introduction to their motion, defendants

8    state:

9                    . . . Knight was the victim of an inmate-on-inmate attack while
                housed at High Desert State Prison on June 27, 2005.  Knight alleges that
10               Defendants were deliberately indifferent to his safety by mistakenly
                classifying him as an R-suffix inmate and releasing him to the general
11               population despite knowledge that doing so placed his safety at risk. . . .

12   Defendants then indicate in a footnote that an "R-suffix" is a "notation included in the custody

13   classification of an inmate with a history of sexual offenses."  Defendants continue as follows:

14                   . . . Knight's lawsuit is based upon two mistaken references to an R-suffix
                designation, including an October 27, 2003, Reclassification Score Sheet
15               and a November 6, 2003, Classification Services Representative (CSR)
                Action chrono.  Knight's custody classification, however, was never
16               modified to include an R-suffix.

17   Defendants outline the following facts, which are derived from plaintiff's deposition testimony,

18   the declarations of defendants, and various documents from plaintiff's central file:

19           1.    A document entitled "CDC Classification Score Sheet" was completed on
                August 1, 2003, incident to plaintiff's arrival at Wasco State Prison;
20
             2.    This document reveals that, when plaintiff was initially scored for
21               classification, he was not designated an R-suffix inmate;

22           3.    Plaintiff's custody classification was reviewed on October 27, 2003, at
                which time an R-suffix was mistakenly included on the score sheet;
23
             4.    No change in plaintiff's custody status was affected by the mistaken
24               addition of the R-suffix on October 27, 2003, because no official
                Classification Committee action had been taken;
25
             5.    Another review was conducted on November 6, 2003, by defendant
26               Oftiedahl;

                                      4

6.    Defendant Oftiedahl noted in a "CDC 128-G CSR Action Chrono" that plaintiff's most recent Reclassification Score Sheet included an R-suffix;

7.    Plaintiff's first Classification Committee meeting was held on November 20, 2003, and plaintiff's was not designated or classified as an R-suffix inmate;

8.    Plaintiff's classification was reviewed at an Administrative Segregation Review Committee meeting held on December 4, 2003, at which time it was noted that defendant Oftiedahl's November 6, 2003, chrono was in error in noting the R-suffix designation because plaintiff had no history of sexual offenses;

9.    The November 6, 2003, chrono was corrected with a notation indicating that the R-suffix designation was "not appropriate" and the reference to the R-suffix was crossed out;

10.   Defendant Lea was a member of the Classification Committee that reviewed plaintiff's custody status on December 4, 2003;

11.   Plaintiff's custody classification never included an R-suffix and he was never classified for custody based on such a designation; and

12.   Following plaintiff's transfer to High Desert State Prison on March 9, 2004, the Classification Committee met several times (March 16, 2004; August 3, 2004; October 13, 2004; April 28, 2005; and May 26, 2005) and, at no time, was plaintiff ever classified as an R-suffix inmate.

Defendants also outline the following facts regarding plaintiff's safety concerns:

1.    Plaintiff approached correctional staff on April 11, 2005, expressing "safety concerns";

2.    On April 22, 2005, plaintiff was placed in administrative segregation pending an investigation into his safety concerns about remaining in the general population;

3.    Plaintiff was retained in administrative segregation following an April 28, 2005, Classification Committee meeting because the investigation was not yet complete;

4.    Although plaintiff alleged at his deposition that defendant Simmerson was a member of the April 28, 2005, Classification Committee, he was not;

5.    The Classification Committee met on May 26, 2005, at which time plaintiff was informed that the investigation had been concluded and it revealed that his safety concerns were limited to B-Facility;

6.    Plaintiff was returned to the general population but assigned to the D-Facility;

5

7.    Defendant Hale was a member of the May 26, 2005, Classification Committee, but defendant Wong was not;

8.    Defendant Gower was a member of the April 28, 2005 classification committee but neither defendants Gower nor Wong were members of the May 26, 2005, committee that released plaintiff to D-Facility; and

9.    On June 27, 2005, plaintiff was attacked by another inmate while housed in the D-Facility following his release to the general population on May 26, 2005.

Plaintiff does not offer any evidence to dispute defendants' statement of the facts.[2]

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

. . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

---

[2]    The court notes that the documents attached to plaintiff's first amended complaint support defendants' outline of the facts.

facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

1  before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

2  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

3  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

4  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

5  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

6  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

7  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

8  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

9

10                                    **III.  DISCUSSION**

11           Plaintiff's claims are based on his contention that defendants were deliberately

12  indifferent to serious risks to his safety.  The treatment a prisoner receives in prison and the

13  conditions under which the prisoner is confined are subject to scrutiny under the Eighth

14  Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509

15  U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . .

16  embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."

17  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh

18  and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison

19  officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and

20  personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official

21  violates the Eighth Amendment only when two requirements are met: (1) objectively, the

22  official's act or omission must be so serious such that it results in the denial of the minimal

23  civilized measure of life's necessities; and (2) subjectively, the prison official must have acted

24  unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.

25  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable

26  mind."  See id.

8

1    Under these principles, prison officials have a duty to take reasonable steps to

2  protect inmates from physical abuse.  See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir.

3  1982); Farmer, 511 U.S. at 833.  Liability exists only when two requirements are met:  (1)

4  objectively, the prisoner was incarcerated under conditions presenting a substantial risk of

5  serious harm; and (2) subjectively, prison officials knew of and disregarded the risk.  See Farmer,

6  511 U.S. at 837.  The very obviousness of the risk may suffice to establish the knowledge

7  element.  See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  Prison officials are not

8  liable, however, if evidence is presented that they lacked knowledge of a safety risk.  See Farmer,

9  511 U.S. at 844.  The knowledge element does not require that the plaintiff prove that prison

10  officials know for a certainty that the inmate's safety is in danger, but it requires proof of more

11  than a mere suspicion of danger.  See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).

12  Finally, the plaintiff must show that prison officials disregarded a risk.  Thus, where prison

13  officials actually knew of a substantial risk, they are not liable if they took reasonable steps to

14  respond to the risk, even if harm ultimately was not averted.  See Farmer, 511 U.S. at 844.

15    Defendants argue that they are entitled to summary judgment because: (1) neither

16  defendant Lea nor defendant Oftiedahl caused plaintiff to be classified as an R-suffix inmate

17  and, therefore, they were not deliberately indifferent to any safety risk related to such a

18  classification; (2) defendants Simmerson, Gower, and Wong were not involved in the decision to

19  release plaintiff to the D-Facility general population; (3) defendant Hale did not release plaintiff

20  to the D-Facility general population in disregard of any known safety risk; (4) even if defendants

21  knew of a risk to plaintiff's safety resulting from his release to the general population, reasonable

22  steps were taken to avoid the risk; and (5) defendants are entitled to qualified immunity.  The

23  court will discuss the first four arguments outlined above in the context of the R-suffix notation

24  (which relates to defendants Lea and Oftiedahl) and plaintiff's release to the D-Facility general

25  population (which relates to defendants Gower, Hale, Simmerson, Lyons, and Wong).  The court

26  will address the issue of qualified immunity as to all defendants separately.

1    A.    <u>**R-Suffix Notation**</u>

2          Plaintiff contends that he was put in danger by the R-suffix designation, which he

3    states branded him as a sex offender.  Defendants argue that "although [Oftiedahl's] CSR chrono

4    erroneously refers to Knight as an R-suffix inmate, the evidence demonstrates that Oftiedahl

5    reasonably relied upon the erroneous reclassification score sheet in Knight's central file because

6    Oftiedahl's responsibility was to review Knight's custody score in order to properly assign him to

7    prison for housing, not to review Knight's central file for the purpose of establishing his custody

8    score."  Defendant also argue that defendant Oftiedahl was not part of any Classification

9    Committee that assigned plaintiff a classification score.  As to defendant Lea, defendants argue

10   that, contrary to plaintiff's allegation, the evidence shows that  defendant Lea "had no part in

11   classifying Knight as an R-suffix inmate and was actually a part of the Classification Committee

12   that discovered the error in Oftiedahl's CSR chrono and had it corrected."  More generally,

13   defendants point out that plaintiff was never actually classified as an R-suffix inmate and his

14   custody level was never based on such a designation.

15         The court agrees that the undisputed evidence defeats plaintiff's claim relating to

16   the R-suffix designation.  Specifically, the evidence shows that the only mention of the R-suffix

17   designation anywhere in plaintiff's file was the erroneous inclusion of the designation on the

18   October 7, 2003, classification score sheet.  The evidence further shows that no classification

19   decision was made based upon the October 27, 2003, score sheet.   Defendant Oftiedahl's

20   November 6, 2003, chrono merely documented that the erroneous R-suffix designation had been

21   included on the October 2003 score sheet.  Additionally, the error was discovered by the

22   December 4, 2003, Classification Committee – of which defendant Lea was a member – and

23   plaintiff's file was corrected.  The court noted in particular that defendant Oftiedahl's chrono was

24   amended to indicate that the R-suffix designation was "not appropriate."

25   / / /

26   / / /

10

1    These facts do not reveal that either defendant Lea or defendant Oftiedahl acted

2  deliberately by placing an R-suffix notation in plaintiff's file for the purpose of making him a

3  target in the prison population.  To the contrary, the evidence shows that the inclusion of the R-

4  suffix was a mistake which was quickly corrected and that plaintiff's classification and custody

5  were never affected by the error.  Because the temporary and erroneous inclusion of the R-suffix

6  designation on the October 2003 score sheet and its mention in the November 2003 chrono was

7  the result of an error, plaintiff cannot establish that defendants were deliberately indifferent to a

8  risk to plaintiff's safety in this regard.  Therefore, the court finds that defendants are entitled to

9  judgment as a matter of law on plaintiff's claim relating to the R-suffix.

10    **B.    <u>Release to D-Facility</u>**

11    Plaintiff claims that, despite knowledge that his release to the general population

12  would pose a danger to his safety, defendants nonetheless released him to D-Facility where he

13  was ultimately attacked by another inmate.  Defendants argue that defendants Simmerson,

14  Gower, and Wong were not involved in the decision to release plaintiff to D-Facility and, for this

15  reason, they are entitled to summary judgment.  As to defendant Hale, defendants contend that he

16  is entitled to summary judgment because the evidence shows that plaintiff was only released to

17  D-Facility after an investigation concerning plaintiff's safety concerns revealed that plaintiff's

18  release to D-Facility should not have posed a safety risk.  Defendants also contend that the

19  investigation into plaintiff's safety concerns constituted a reasonable step to ensure plaintiff's

20  safety which defeats any Eighth Amendment claim arising from the inmate attack after plaintiff

21  was released to D-Facility.

22    The evidence reflects that plaintiff approached staff on April 11, 2005, to express

23  "safety concerns" about remaining in the general population.  On April 22, 2005, plaintiff was

24  removed from the general population and placed into administrative segregation pending the

25  outcome of an investigation into his concerns.  On April 28, 2005, plaintiff's administrative

26  segregation placement was continued because the investigation had not been completed.

1   Defendant Gower was a member of this committee, but defendants Hale, Simmerson, and Wong

2   were not.  On May 26, 2005, another classification committee met to inform plaintiff that the

3   investigation had been completed and that his safety concerns were limited to B-Facility.  Based

4   on this, the committee decided that it was safe to release plaintiff to the general population in D-

5   Facility.  Defendant Hale was a member of the May 26, 2005, committee, but defendants

6   Simmerson, Gower, and Wong were not.

7           The court finds that the undisputed facts show that defendants took reasonable

8   steps to address plaintiff's safety concerns.  Specifically, after learning of his concerns, plaintiff

9   was removed from the general population and placed in administrative segregation.  Further, an

10  investigation into plaintiff's concerns was conducted which revealed that the concerns were

11  related to B-Facility and that there was no known safety risk related to D-Facility.  Because of

12  these steps, plaintiff cannot establish that defendants were deliberately indifferent to a known

13  risk to plaintiff's safety.

14          Further, the evidence establishes that there is no link between defendants Gower,

15  Simmerson, or Wong and the decision to return plaintiff to the general population at D-Facility.

16  Specifically, that decision was made at the May 26, 2005, classification committee meeting and

17  only defendant Hale was a member of that committee.  While defendant Gower was a member of

18  the April 28, 2005, classification committee, that committee did not place plaintiff in the general

19  population but, instead, retained plaintiff in administrative segregation pending completion of the

20  investigation.  There is no evidence that defendants Simmerson, Lyons, or Wong were members

21  of either the April 28, 2005, or May 26, 2005, committees.  Thus, Hale was the only named

22  defendant to actually participate in the decision to return plaintiff to the general population.  As

23  discussed above, defendant Hale cannot be liable because the decision was made after reasonable

24  steps to ensure plaintiff's safety were taken.

25  / / /

26  / / /

1    Finally, the court addresses plaintiff's allegations as to defendant Lyons.[3]  Plaintiff

2 claims that, when he first approached correctional officers on April 11, 2005, with his safety

3 concerns, defendant Lyons overheard the conversation and said, within earshot of other inmates,

4 that plaintiff had been designated an R-suffix inmate because plaintiff had "killed his wife and

5 stabbed his step daughter."  Plaintiff asserts that, given that other inmates heard this statement,

6 defendant Lyons was deliberately indifferent to the risk associated with being labeled with the R-

7 suffix designation.  Because defendants have not presented any evidence to the contrary, the

8 court will assume for the moment that these allegations are true.

9    Even assuming that defendant Lyons made the statement attributed to him, and

10 assuming this statement caused other inmates in the general population to believe that plaintiff

11 was an R-suffix inmate, defendant Lyons cannot be held liable for the attack on plaintiff.  As

12 discussed above, plaintiff was removed from the general population and an investigation was

13 conducted after defendant Lyons' alleged statement.  The investigation revealed that any risk

14 associated with placement in the general population was limited to B-Facility and that D-Facility

15 was safe.  Thus, it follows that, to the extent any inmates would have posed a risk to plaintiff

16 because they believed he was an R-suffix inmate, those other inmates were not in D-Facility,

17 which was deemed safe for plaintiff.  As defendant Lyons states in his joinder, he is entitled to

18 the same defense as the other defendants based on the reasonable steps which were taken to

19 provide for plaintiff's safety.

20 / / /

21 / / /

22 / / /

23 / / /

---

25    [3]    Defendant Lyons joined in the other defendants' motion for summary judgment,
but has not submitted his own declaration or outlined any undisputed facts specifically relating to
him.  Rather, in his joinder, defendant Lyons argues that he is "entitled to the same defenses" as
26 the other defendants.

1    **C.    <u>Qualified Immunity</u>**

2            Government officials enjoy qualified immunity from civil damages unless their

3    conduct violates "clearly established statutory or constitutional rights of which a reasonable

4    person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In general,

5    qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

6    law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

7    immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting

8    the injury, the facts alleged show the defendant's conduct violated a constitutional right. <u>See</u>

9    <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

10   step is to ask whether the right was clearly established. <u>See</u> <u>id.</u>  This inquiry "must be undertaken

11   in light of the specific context of the case, not as a broad general proposition . . . ." <u>Id.</u>  "[T]he

12   right the official is alleged to have violated must have been 'clearly established' in a more

13   particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

14   clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> at

15   202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

16   officer in similar circumstances would have thought his conduct violated the alleged right. <u>See</u>

17   <u>id.</u> at 205.

18           When identifying the right allegedly violated, the court must define the right more

19   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

20   factual circumstances surrounding the alleged violation. <u>See</u> <u>Kelly v. Borg</u>, 60 F.3d 664, 667

21   (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

22   sufficiently clear that a reasonable official would understand [that] what [the official] is doing

23   violates the right." <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  Ordinarily, once the

24   court concludes that a right was clearly established, an officer is not entitled to qualified

25   immunity because a reasonably competent public official is charged with knowing the law

26   governing his conduct. <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982).  However, even

1    if the plaintiff has alleged a violation of a clearly established right, the government official is

2    entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that

3    his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th

4    Cir. 2001); see also Saucier, 533 U.S. at 205.

5            The first two steps in the qualified immunity analysis involve purely legal

6    questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a

7    legal determination based on a prior factual finding as to the government official's conduct. See

8    Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). In resolving these issues, the court must

9    view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

10   in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

11           Defendants' argue:

12           When analyzing Knight's claim under the second *Saucier*-step, one
     must come to the conclusion that all the Defendants acted reasonably and
13   in a manner where they could have believed their conduct was reasonable
     and lawful. Defendant Lea was part of the Classification Committee that
14   discovered Knight was incorrectly scored as an R-suffix inmate and
     therefore, the error was noted and corrective measures were taken. (SSF
15   No. 17-18). None of Lea's conduct suggests that her actions were
     unconstitutional. Likewise, Defendant Oftiedahl reasonably relied on
16   Knight's most recent classification scoring sheet and issued a chrono
     indicating Knight's records reflected an R-suffix. (SSF No. 42-43, 47).
17   No CSR officer in Oftiedahl's position would believe their action was
     unconstitutional.
18           Defendants Simmerson, Gower, and Wong were not members of
     the Classification Committee that determined Knight should be returned to
19   the general population. (SSF No. 48). Simmerson, Gower, and Wong
     would have no reason to believe any of their conduct resulted in releasing
20   Knight into the general population, where he would be at a risk for attack,
     in light of the completed safety investigation. (SSF No. 28, 44- 45).
21           Lastly, although Defendant Hale was a part of the Classification
     Committee that released Knight to the general population, Hale could have
22   reasonably believed his conduct was constitutional because the prison had
     segregated Knight from the general population while it conducted an
23   investigation into Knight's possible safety risks. (SSF No. 27). It was not
     until after the investigation was completed, and a yard that was believed to
24   be safe for Knight was determined, that Knight was then released to that
     yard. (SSF No. 28, 44-45). Accordingly, all Defendants are entitled to
25   qualified immunity and should be dismissed.

26   ///

The court agrees with defendants' analysis.  As to the R-suffix issue, the evidence shows that the notations on the October 2003 score sheet and November 2003 chrono were the result of an error and that this error was quickly corrected.  Thus, assuming that a clearly established constitutional right had been violated by the erroneous notations, defendants could have reasonably but mistakenly believed that their conduct in correcting the error cured any violation.  Similarly, defendants could have reasonably believed that, by removing plaintiff from the general population after learning of his safety concerns in April 2005, and by investigating those concerns, they took reasonable steps to protect plaintiff from a risk to his safety.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' unopposed motion for summary judgment (Doc. 39) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 9, 2009

_Craig M. Kellison_
_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE